## NELLIE McPHERSON v. DENNIS T. RYAN.

*Breach of promise to marry—Defendant's wealth—Exemplary damages—Declarations of plaintiff as evidence.*

MORSE, J. 1. On the trial of an action for damages for breach of an alleged promise to marry, defendant's wealth is a proper subject of inquiry.

2. Where the manner of breaking off an engagement to marry was abrupt and wanton, and most humiliating to the young girl with whom it was made, and the defendant is shown to be worth from fifteen to twenty thousand dollars, engaged in a profitable business and of good social standing, an award by the jury of $4,500 damages can hardly be called excessive. (All of the Judges concur.)

3. The declarations of the plaintiff made to third parties in the absence of the defendant "that she was engaged to the defendant and he was going to marry her," were not admissible as evidence of her promise to marry defendant. The admissibility of this kind of testimony has been sustained where the parties were not allowed to testify in their own behalf, but the reason for this exceptional rule of evidence having ceased to exist, in this State, the rule should cease also. In the language of the Supreme Court of Massachusetts, "a mutual promise of marriage is not composed of two distinct

parts, unconnected with each other, and to be severally proved by independent evidence. A promise by the defendant at one time and the assent of the plaintiff at another, will not do. The conduct of the plaintiff in the absence of the defendant, and not in any way connected with him, has no more tendency to prove that he received her promise than it has to prove that he made one to her: *Russell v. Cowles*, 15 Gray 586." The court erred, I think, in directing the jury to consider the acts and declarations of the plaintiff, not in the presence of the defendant, to prove the promise of marriage, and for these reasons a new trial should be granted. CHAMPLIN, J., concurred.

CAMPBELL, C. J., and SHERWOOD, J., dissented, and by the equal division of the Court the judgment below was affirmed.

Error to Wayne. (Jennison, J.) Argued November 5, 1885. Decided January 13, 1886.

Action for damages for breach of promise to marry. Judgment for plaintiff. Defendant brings error. Affirmed.

*Brennan & Donnelly* and *John Atkinson* for defendant:

Conceding that after the defendant's promise to marry has been proven, the statements of plaintiff made to third persons, in his absence, are admissible to show her readiness to perform the contract: *Leckey v. Bloser*, 24 Penn. St. 401; *Thurston v. Cavenor*, 8 Ia. 162; although such evidence seems extremely dangerous and uncertain even for that purpose, we insist that in this case these declarations were used to establish the contract on the part of the defendant, and no proper instructions were given to the jury to prevent their giving them weight in that direction, and they were inadmissible for any such purpose: *Walmsley v. Robinson*, 63 Ill. 41; *Russell v. Cowles*, 15 Gray, 583.

The evidence of Madam Van Dyke was still more objectionable. She was allowed not only to testify to plaintiff's declarations in the absence of defendant, but to inject into the case her own surmises and suspicions and her arguments that both were well grounded. This was clearly incompetent: *Vanderpool v. Richardson*, 52 Mich. 336; *Ward's Central & Pacific Lake Co. v. Elkins*, 34 Mich. 439.

*James H: Pound* for plaintiff:

Evidence of the wealth of defendant was clearly competent: *Miller v. Rosier*, 31 Mich. 475; *Bennett v. Beam*, 42 *Ib.* 349. The court correctly instructed the jury that if they

should find from the evidence that the defendant wantonly, wilfully and without just cause broke the engagement they would be justified in considering not only the injury to the plaintiff's feelings, but any circumstances of indignity under which the wrong was done and the consequent public disgrace and mortification to the plaintiff. You must find from the *evidence*, however, that this damage resulted from the defendant's breach of the contract: *Miller v. Rosier*, 31 Mich. 475; *Vanderpool v. Richardson*, 52 Mich. 339–40.

The law authorizes punitive damages to be assessed by the jury in this class of cases: *Smith v. Woodfine*, 1 C. B. (N. S.) 660; *Johnson v. Jenkins*, 24 N. Y. 252; *Thorn v. Knapp*, 42 N. Y. 474: 1 Wait Actions and Defenses, 728.

Having shown defendant's promise, *prima facie*, by the evidence of plaintiff and other witnesses, the declarations of plaintiff were admissible to prove her own consent, in addition to her own oath. They bore on the damages sustained by plaintiff, showing how widely the indignity put upon her in her casting off was known and also the mutuality of the promise—her promise: *Russell v. Cowles*, 15 Gray, 582; *Ray v. Smith*, 9 Gray, 141; *Hoitt v. Moulton*, 21 N. H. 587; *M'Kee v. Nelson*, 4 Cowan, 355; *King v. Kersey*, 2 Carter (Ind.), 402; *Wetmore v. Nell*, 1 Ohio St. 27; *Ellis v. Guggenheim*, 20 Penn. St. 289; *Leckey v. Bloser*, 24 Penn. St. 406; *Thurston v. Cavenor*, 8 Ia. 155–63; *Reed v. Clark* 47 Cal. 194, 205; *Peppinger v. Low*, 6 N. J. L. (Halstead) 384 (the leading case in this country); *Johnson v. Leggett*, 28 Kan. 600.

MORSE, J. The plaintiff brought suit in the circuit court for the county of Wayne to recover damages for an alleged breach of promise to marry, and obtained judgment against the defendant for $4,500. Numerous errors are alleged to have taken place upon the trial, and we shall endeavor to notice those that we deem material.

1. The defendant's counsel insist with great earnestness that there was no evidence tending to show the defendant's promise to marry plaintiff, save that which was clearly incompetent, and that the court should have directed the jury to find for the defendant because of the want of such testimony. We see no reason to change our views as intimated on the argument upon this subject. Putting aside, for the purposes of this question, all evidence of the plaintiff's

declarations in the convent to Sister Van Dyke and Miss
Grandy, or at home to her parents and relatives, the testi-
mony of the plaintiff and defendant, taken together, was
sufficient, without other corroboration, to warrant the sub-
mission of the case to the jury.    While there seems to be
but little, if any, evidence of a formal declaration of mar-
riage by the defendant, and a formal acceptance by plaintiff,
it is nevertheless very evident that there is much in the tes-
timony of these two, and their acts, tending to show a tacit
and well-understood agreement between them to marry,
although no definite time was ever fixed for the ceremony.
The plaintiff's evidence shows that she joined the Catholic
church, and attended the Convent of the Sacred Heart,
because of their intended marriage, and for no other rea-
sons; that she told defendant if he did not intend to marry
her, she did not wish to attend the convent, and that he
replied he did.   When he proposed to stand as her godfather
upon her entry into the Catholic church, she told him that
he could not do so if he was ever going to marry her, and
he said, "That settles it."    The defendant denies these
promises and conversations, but the fact remains from his
own evidence that he abandoned the idea of acting as
sponsor, and procured a friend to act in his stead, because
of the reason she gave for his not doing so.   He admits that
he paid her tuition at the convent, and thought she was a
bright, pleasant girl, and that "perhaps it might possibly be,
if ever she got around so I thought she would satisfy me for
a wife, that possibly, under some circumstances I might
marry her."   He asked her at one time that in case he was
ever married to her, would she want everything his brother
John's wife had.    When the relations were broken off
between them, as she testifies, she left the convent, and he
admits that he gave her to understand that he did not intend
to marry her, and wanted nothing more to do with her.    As
soon as he informed her that he did not intend to marry her,
his visits to and his assumed guardianship over her ceased,
and they became as strangers.    The relations and intimacy
between them prior to this seems to tend as strongly towards

supporting her statement of a mutual promise to marry as it does towards sustaining his theory. The sudden ending of his care over her, and the conduct of the parties thereafter, certainly has as much the appearance of the breaking of a matrimonial engagement as it does the sundering of a platonic friendship, with only a hazy idea of possible marriage in the distant future. The promise to marry was also supported by the testimony of the parents and the brother of plaintiff, who gave evidence tending to show an admission of defendant that he was engaged to plaintiff, and that he formally asked and obtained the consent of the father and mother to the marriage.

2. It is also alleged as error that the court permitted Sister Van Dyke and Miss Grandy to give evidence that the plaintiff, while she was in the convent, told them, in substance, that she was engaged to the defendant, and he was going to marry her; and that these declarations, not in the presence of defendant, were allowed to be used, not alone to show damage, but as evidence in corroboration of the main fact to be established, the existence of a promise to marry. There is no doubt but it was so used. The court instructed the jury:

"And if you find that the defendant promised to marry the plaintiff—for that is the first thing to find—then the conduct of the plaintiff and her statements, even though not in the presence of the defendant, are admissible for the purpose of showing that she promised to marry him."

Also, further in his charge, the court says:

"You have heard the plaintiff's story regarding her acquaintance with the defendant; the letters passing between them; * * * her attending the church to which defendant belonged; his sending her to the convent to improve her education. * * * She has also brought as witnesses her parents, who have testified that the defendant came to their house, and asked their consent to the marriage, which they say was given. She has also introduced the testimony of Madame Van Dyke and the Ohio school-mate."

This directly authorized the jury to take into consideration the declaration of plaintiff to Madame Van Dyke and Miss

Grandy, made in the absence of defendant, with the other facts, to establish the promise of marriage and the nuptial engagement between the parties. This was error. It was nothing more nor less than using the declarations of plaintiff in her own behalf to establish her case. I know there is authority to sustain the admissibility of this kind of evidence to prove the woman's promise, but this exception to the general rule against such testimony, allowed in breach of promise cases, seems to have been founded upon an apparent necessity when parties were not allowed to testify in their own behalf. The contract to marry not generally being made in the presence of witnesses, the declarations of the plaintiff and her actions were, to use the language of the courts allowing such evidence, "frequently the only, and ordinarily the best and most satisfactory, evidence of the existence of the engagement." Nearly all the decisions supporting the admission of these declarations were pronounced while the parties were yet ineligible to give the making of the promise and its breach in evidence, and the others have followed the rule after the reason for it has ceased to exist. While the plaintiff could not herself testify as to the marriage contract, the law allowed a wide and liberal range of evidence to establish it. All facts showing the personal intimacy of the parties; the conduct of the plaintiff, as well as of the defendant; the action of the plaintiff's parents; the purchase of the wedding outfit, and other preparations looking towards an approaching marriage; the declaration of the plaintiff as to the fact of her engagement and intended union with the defendant, were admitted to prove a promise of marriage, being from the nature of things the best evidence then attainable to prove it. But under our statute, when the plaintiff is permitted, as she was in this case, to fully and freely testify in her own behalf to the fact of the promise itself, and every incident in detail connected with it, the reason for allowing her to use her declarations, made subsequently without the knowledge or consent of the defendant, to corroborate her own oath, no longer exists. And every reason that applies to

the exclusion of this kind of testimony in other cases forbids its further use in actions of this nature. The plaintiff, as courts and juries must ever be constituted, has certainly advantage enough of the defendant, without giving her the opportunity of fabricating, by her acts and declarations, without his consent or knowledge, evidence to make a case against him. It would place almost any man at the mercy of an evil-disposed and designing woman. An adventuress could come into court and swear to a promise of marriage, and then bring others of like ilk, her friends and intimates, to sustain her with testimony of the stories she had told them in furtherance of her plan to secure damages. There is no necessity of throwing open the door of courts to such opportunities to work injustice. When the plaintiff has the equal right with the defendant to place fully before the jury the story of her wrongs aided, as she will ever be, by the sympathy always accorded to both the weakness and the beauty of her sex—a sympathy which the most rigid administration of justice cannot entirely prevent—right and equity demand that she shall no longer have the aid which the law refuses in all other cases.

"The law has an open ear for the complaints of deserted innocence, and the tribunals of the law are quite ready enough to give full effect to such evidence as is usually submitted in actions of this sort to prove the promise of the recreant lover; but if he is to be charged with infidelity to his vows, not upon proved circumstances, but upon the surmises, suspicions, opinions, and inferences of witnesses, we shall be in great danger of producing more evils than we remedy, and of sacrificing the legal rights of a man to redress the imagined wrongs of a woman."

This language, by Justice Woodward, in 24 Pa. St. 405, naturally applies to some of the evidence permitted in the case before us; and particularly to the testimony of Madame Van Dyke, who was allowed to state her surmises, inferences and suppositions that the plaintiff and defendant were engaged to be married, obtained wholly from the acts and declarations of the plaintiff in the absence of defendant. The theory that these declarations are admissible to prove

her promise will not avail.    I believe, with the supreme court of Massachusetts, that

"a mutual promise of marriage is not composed of two distinct parts, unconnected with each other, and to be severally proved by independent evidence.    A promise by the defendant at one time, and the assent of the plaintiff at another, will not do.    The conduct of the plaintiff, in the absence of the defendant, and not in any way connected with him, has no more tendency to prove that he received her promise than it has to prove that he made one to her :" *Russell v. Cowles*, 15 Gray, 586.

The tendency of the later cases is to exclude declarations of this kind, and even evidence of preparations for marriage by the plaintiff have been held inadmissible : *Russell v. Cowles*, 15 Gray, 583 ; *Walmsley v. Robinson*, 63 Ill. 42 ; *Cates v. McKinney*, 48 Ind. 562 ; *Graham v. Martin*, 64 Ind. 573. To prove the promise as to either in this way is to prove it as to both.    These declarations of plaintiff to Madame Van Dyke and the schoolmate, and their "surmises" and inferences therefrom, could not be used to prove the engagement of plaintiff to defendant without necessarily showing, as it did, his engagement to her, and his promise to marry.    Indeed, the testimony of Madame Van Dyke was that she "learned from Nellie positively that they were affianced, not from Mr. Ryan."    She "surmised it, and Nellie had positively told us it was a fact."    Miss Grandy testified :    "She told me that Mr. Ryan was sending her there, and that they were engaged to be married as soon as she was out of school."    It is very clear that the language of these witnesses tended equally to prove a promise by each to marry the other.    It could not be used to establish her promise without proving his also ; and, under the direction of the court, it was so used.

It was also error, within the same principle, to admit evidence that the neighbors knew that plaintiff was in the convent at defendant's expense, preparing to get married, when it turned out upon cross-examination, as it naturally would, that all the neighbors knew about it was what the plaintiff's mother had told them.    It was the veriest hearsay.

3. Errors are alleged in the admission and rejection of testimony upon the subject of defendant's wealth. It was a proper subject of inquiry, and we do not think the defendant was harmed by the course of the investigation in that respect. The whole inquiry, as shown by the record, taking the testimony introduced by both parties, was a fair one, and probably brought before the jury the financial standing and ability of the defendant as fairly and fully as can ordinarily be done in court.

4. The court erred, I think, in directing the jury, as heretofore stated, to take into consideration the acts and declaration of the plaintiff, not in the presence of defendant, to prove the promise of marriage, but I find no objection to the balance of his charge. It is strongly contended that the court should have instructed the jury that there was no evidence in the case which would justify exemplary or punitive damages. If the story of the plaintiff is a true one, the manner of breaking off the engagement was abrupt and wanton, most humiliating to a young girl in her circumstances and condition, and the damages awarded by the jury, if they believed her testimony, can hardly be called excessive, when we consider the financial and social standing of the defendant.

I can find no other material errors in the record, but for those noted, in my opinion a new trial should be granted, with costs of this Court to defendant.

CHAMPLIN, J., concurred.

CAMPBELL, C. J. I do not concur in the views of my Brother MORSE in regard to the effect of the change of law allowing parties to testify, upon the old law. There is nothing in that statute which indicates a purpose to exclude any testimony theretofore admissible, and there is certainly no inconsistency between the new rule and any old one, except that which kept out the evidence of parties as witnesses. The rules of evidence are as much rules of law as any other rules, and I do not see how they can be lawfully abolished by judicial action, any more than any other laws.

Courts may, in their judicial action, apply old rules to any new circumstances, to which they are applicable, but they cannot properly make new laws of evidence.

It is always dangerous to assume what reasons have led in the past to certain legal rules. If the rule exists, the reasons are not material. In searching out those reasons we can rarely reach the origin of the provision, and judges who infer, from their own notions or their own experience, what probably gave rise to it, may easily be mistaken. In regard to the rule in question, some judges may have considered it as the offspring of necessity, in whole or in part. But it has also been regarded as founded on good sense, and opening sources of information quite as satisfactory as testimony of the parties. If not admissible independently, such circumstances cannot be received in corroboration, and their corroborative force is, I think, very manifest. No such case can be fully appreciated without a knowledge of the surroundings.

The common-law system is the only one which contains any regular system of rules of exclusion, going beyond certain personal disqualifications. In all other matters, courts in countries not governed by the common law generally admit such testimony as will throw light on the facts, trusting to good sense to limit the facts to legitimate conclusions. All lawyers know that the excluding rules of the common law are often unjust and destructive of truth. There has been no tendency in our legislation in the way of adding to grounds of exclusion. While those rules are in force, they must be followed, however unwise we may find them to be. But I do not think courts have any right to legislate against or for their extension; and if we had such power, I should be disposed to open rather than to shut the door on any sources of information. I think the judgment should be affirmed.

SHERWOOD, J., concurred.