## VAUGHAN *v.* SMITH.

[No. 21,867. Filed November 28, 1911. Rehearing denied February 2, 1912.]

1. APPEAL.—*Weighing Evidence.—Setting Aside Verdict.—Rule.—* The weight and preponderance of the evidence will not be determined on appeal, and it is only where there is no evidence to prove some fact essential to the verdict that it will be set aside on the ground of insufficiency of the evidence. p. 116.

2. BREACH OF MARRIAGE PROMISE.—*Verbal Contract.*—*Statute of Frauds.*—A verbal contract to marry is enforceable, if it is to be performed within a year from its making; otherwise it is within the statute of frauds and not enforceable.   p. 116.

3. BREACH OF MARRIAGE PROMISE.—*Abandonment of Contract.*— *Evidence.*—Where the evidence in an action for breach of marriage promise showed that after entering into a verbal agreement to marry three years from date of the death of defendant's wife, the plaintiff and defendant had some difficulty with reference to defendant's conduct toward the plaintiff which culminated about a year after the agreement was entered into, and that thereupon the defendant suggested that they "play quits" to which the plaintiff said "Very well, * * * if that be your wish, why you may return my letters," and this conversation was followed by a return of the letters on the following day and a cessation of calls by defendant, it was sufficient to warrant the jury in finding that the agreement had been mutually abandoned.   p. 116.

4. BREACH OF MARRIAGE PROMISE.—*Abandonment of Contract.*— *New Contract.*—*Evidence.*—Where the evidence showed that a few days after the mutual abandonment of a promise to marry the defendant renewed his visits and attentions, and that thereafter, when discussing the advisability of plaintiff moving to another town, defendant said: "It will only be a short time now until we marry," in response to which plaintiff asked: "Why not marry now?" that defendant then said: "I am a man of my word, and when the three years are up, I will marry you," to which plaintiff answered: "All right, * * * I will marry you when the three years are up," and that the defendant then fixed the month of October next ensuing as the time for the marriage; such evidence, together with that showing the situation and former relations of the parties, was sufficient to warrant the jury in finding that a new agreement to marry had been entered into.   p. 119.

5. BREACH OF MARRIAGE PROMISE. — *Contract.* — *Evidence.* — *Conduct and Relations of Parties.*—A contract to marry may be proved by the acts and conduct of the parties, and for this purpose evidence of their relationship and acts relevant to the promise of marriage, from the inception of their courtship, is admissible.   pp. 120, 124.

6. BREACH OF MARRIAGE PROMISE.—*Damages.*—*Pecuniary Standing of Defendant.*—*Specific Evidence.*—In an action for breach of a marriage promise specific evidence of the defendant's pecuniary circumstances is admissible to enable the jury to fix the money value for loss of material benefit and social standing occasioned by the breach.   p. 120.

7.  TRIAL.—*Evidence.—Rebuttal.*—Where there was evidence, in an action for breach of promise to marry, to show that defendant was practically a daily visitor at the home of plaintiff in May, 1904, which was denied by the plaintiff who testified that the last three weeks of that month he was away on a trip to Kentucky, and that he had not made such trip in 1903, it was not error to admit on rebuttal the testimony of witnesses as to a conversation in 1904, in which defendant told of making a similar trip in 1903.   p. 122.

8.  BREACH OF MARRIAGE PROMISE.—*Contract.—Evidence.—Letters and Post Cards.*—Where the plaintiff in an action for breach of a marriage promise testified that at the time of her removal from the city in which defendant lived an agreement to marry existed between them, and which was denied by defendant, who testified that plaintiff left the city abruptly and had never had any communication with him thereafter, it was not error to permit plaintiff to prove in rebuttal that after such removal she had written and mailed letters and post cards to the defendant. p. 122.

9.  TRIAL.—*Instructions.—Breach of Marriage Promise.—Directing Jury not to Consider Prior Promise.—Refusal.*—In an action for the breach of a promise to marry alleged to have been made subsequently to the abandonment of a prior agreement between the parties. it was not error to refuse instructions requested by defendant in which the jury was told that the prior promise to marry could not be considered for any purpose in determining whether the alleged subsequent promise had been made.  p. 123.

10.  TRIAL.—*Instructions.—Reciting Conversation of Parties.—Invading Province of Jury.*—A requested instruction, in an action for breach of promise to marry, which recited the alleged conversation of the parties relative to marriage, and told the jury that if it found that such conversation had occurred the same would not constitute a valid contract of marriage, invaded the province of the jury and its refusal was proper.  p. 125.

11.  TRIAL.—*Instructions.—Points Covered by Other Instructions. —Refusal.*—Where instructions tendered and requested were in legal effect but restatements, with varying language, of points correctly instructed on in the court's instructions, their refusal was not error.  p. 125.

12.  TRIAL.—*Instructions.—Misleading to Jury.—Refusal.*—It is not error to refuse an instruction which would tend to mislead the jury.  p. 126.

From Wayne Circuit Court; *Henry C. Fox,* Judge.

Action by Susan J. Smith against John D. Vaughan.

From a judgment for plaintiff, the defendant appeals. (Transferred from the Appellate Court under §1405 Burns 1908, Acts 1901 p. 590.) *Affirmed.*

*Thomas J. Study* and *Wilfred Jessup,* for appellant.

*Henry U. Johnson* and *Robbins & Robbins,* for appellee.

Cox, J.—This action was brought to recover damages for breach of an alleged verbal contract of marriage.

The original complaint, consisting of one paragraph, was filed on December 24, 1907, in this it was alleged that on the —— day of ——, 1905, appellant, in consideration of the promise of appellee to marry him upon request, promised and agreed to marry her. No proceedings were taken in the cause upon this complaint.

Appellee, on January 20, 1908, filed an amended complaint, which was very materially and essentially different from the original complaint, and in which it was alleged that appellant's former wife died on October 7, 1903, and on June —, 1904—the exact date appellee being unable to give—appellant, in consideration of the promise of appellee to marry him, then and there promised and agreed to marry her at the expiration of three years from the date of his wife's death; that at many and divers times thereafter, down to April —, 1906, in consideration of appellee's promise, made as aforesaid, to marry appellant, appellant promised and agreed to marry appellee at the expiration of the period of time aforesaid; that in April, 1906—the exact date appellee is unable to give—appellant, in consideration of her promise to marry him, made as aforesaid, promised and agreed to marry her on October 7, 1906. Appellant filed a general denial to this complaint, and the issue thus formed was submitted to the jury for trial on April 13, 1908.

Near the close of the trial, appellee filed a motion for leave to amend her complaint. The motion being granted, appellant excepted thereto, and appellee filed her second amended complaint. In this amended complaint, appellee alleged

that on October 7, 1903, the former wife of appellant died, and on June —, 1904, he promised and agreed to marry appellee at the expiration of three years from the death of his former wife; and that in March or April, 1906, he promised and agreed to marry her on October 7, 1906, or thereafter during said month.

On the motion of appellant, appellee was required to and did separate the several causes of action set up in said last amended complaint into separate paragraphs and separately number them.

The appellee then filed a third amended complaint, in two paragraphs, in the first of which she alleged that appellant's wife died on October 7, 1903, and on June —, 1904, he promised and agreed to marry appellee at the expiration of three years from the death of his former wife. In the second paragraph it was alleged that in March or April, 1906, he promised and agreed to marry her on October 7, 1906, or thereafter during said month.

Appellant filed a demurrer to each paragraph of this last amended complaint, which was sustained to the first paragraph and overruled to the second.

Appellant filed an answer of general denial to the second paragraph of this amended complaint.

The cause was tried by jury, and a verdict was returned against appellant for $2,500, and judgment was rendered thereon.

The errors assigned and not waived are all based on alleged errors of law occurring during the trial, and presented to the trial court in appellant's motion for a new trial, which was overruled.

The first in the order in which these alleged errors are presented and argued by counsel in the briefs filed in the cause is that the verdict is not sustained by sufficient evidence and is contrary to law.

It has been decided times not readily numerable that this court will not weigh the evidence and determine the pre-

ponderance, and that it is only where there is no legal evidence to prove some fact, material and essential to the prevailing party, that a verdict or finding will be set aside on the grounds above assigned. While appellant, as a witness for himself, vigorously, if ungallantly, denied any promise whatever on his part to marry, or any love making with such serious intent, it may be said that the evidence is overwhelmingly against him, and it is conceded by his counsel that a verbal contract of marriage was proved to have been made between the parties on June 20, 1904, which was to have been consummated three years from the date of the death of appellant's wife, which had occurred on October 7, 1903. Counsel for appellee concede for her that this contract, because not to be performed within a year from its making, was within the statute of frauds and not enforceable. §7462, clause 5, Burns 1908, §4904 R. S. 1881; *Paris* v. *Strong* (1875), 51 Ind. 339. But it is apparent that the cause was finally submitted to the jury on the theory that such agreement had been mutually rescinded and abandoned and subsequently succeeded by another verbal contract between the parties entered into in March or April, 1906, by the terms of which they were to marry in October of that year. Such a contract is not within the statute of frauds, and may be enforced. *Short* v. *Stotts* (1877), 58 Ind. 29; *Caylor* v. *Roe* (1884), 99 Ind. 1.

The whole argument on the question of the sufficiency of the evidence centers on two questions: (1) Was the original contract of 1904 mutually abrogated? (2) Was there, thereafter, a new engagement between the parties to marry? If there was evidence given on the trial of the cause from which the jury could have found facts from which these questions could be answered in the affirmative, then the verdict cannot be disturbed for insufficiency of the evidence.

The evidence shows that early in the spring of 1904 appel-

lee became the tenant of an apartment in a flat building which appellant then owned. Shortly thereafter appellant began paying court to her, and in June of that year they reached an agreement to marry three years from the date of the death of the wife of appellant, as above stated. While the testimony of many witnesses show that appellant was constant and loverlike in his attentions to appellee for more than a year after this agreement was entered into by them, yet appellant did not obtrude their intimacy outside of their immediate family, or upon the larger world of the city in which they lived, by taking appellee to church, places of amusement and social gatherings. This caused criticism of appellant by the relatives and friends of appellee, and she told him of it. These criticisms of appellant's neglect to take appellee out and show her attentions publicly had been brought to his notice several times, and he made excuses and became irritated. Appellee testified about this trouble, which is stated to have culminated about a year after the original contract was entered into, and said she had told appellant what her sister had said about this matter, and that he had said that if she intended to listen to her sister and let her people interfere, he did not see how they were going to get along, and that he thought they had better "play quits". She further testified that she answered him, "Very well, Mr. Vaughan, if that be your wish, why, you may return my letters." This conversation was on a Saturday night. Appellant was, she testified, angry and indignant. The next day he returned her letters, and perhaps for a few days after that he did not call on her. Whether the contract of 1904 was mutually abandoned by the parties, was a question of fact for the jury, and was so submitted to them by the court under proper instructions. The jury necessarily found that that contract was abrogated, or it could not have returned the verdict it did for appellee, under the instructions given by the court. While it is shown by the transcript of the evidence that appellee gave some testimony

not entirely in harmony with the conclusion that the first contract was rescinded at the time of and by the agreement to "play quits", and the return of appellant's letters, yet the latter testimony was given by her as her ultimate and positive recollection of the matter, and if the jury believed it—as they evidently did—we cannot say that it was not warranted in saying by its verdict that it constituted a mutual abandonment of the agreement to marry. The words are apt, and the conduct of the parties immediately following is in harmony with an intention on the part of both to end their relation as engaged lovers. Appellant proposed that they "play quits"; appellee said "very well, return my letters." The letters were returned the next day. Appellant was indignant and angry, and, contrary to his usual practice, did not return for several days. The court is not wholly unaware of the fact, which is a part of the knowledge common to mankind, that a lover's "tiff", brought on by circumstances similar to those which produced the one here, is frequently followed by an agreement to "play quits", and that the return of mementoes and insignia of the betrothed state, like letters, follows and puts a period to the agreement to marry. The jury must have had this knowledge, and had the right to apply it in drawing the inference from the above facts that the contract, made in 1904, was abandoned and rescinded by the parties. Had the contract in question not been within the statute of frauds, had appellant refused to carry it out, and in a suit for its breach pleaded a release or rescission, sustained it by this same evidence, and procured thereby a verdict favorable to himself, such verdict surely could not be deemed unsupported by the evidence, but would have to be sustained on appeal. See *Kellett* v. *Robie* (1898), 99 Wis. 303, 74 N. W. 781; *Davis* v. *Bomford* (1860), 6 H. & N. 245.

Having determined that the jury was justified in finding that the original marriage contract of 1904 was mutually

abandoned, it is still to be determined whether there was evidence from which the jury might have found that a new and valid agreement had been made. The evidence shows that appellant, after the few days following the return of appellee's letters, when he did not visit her, renewed his visits and attentions, and continued them in much the same manner as characterized the first year of his acquaintance with her, but that little, if any thing further, was said between them about marriage until March or April, 1906. At that time it appears that appellee told appellant that her daughter, who had been away teaching school, was to be with her during the summer, and that her niece, who had a young baby, would also be with her, that her daughter was not in good health, and did not like the way appellant was treating appellee; that the rooms in the flat were hot, and would not be pleasant for all of them there, and that it would not be pleasant for him to continue his visits to her there, under the circumstances, and that she was thinking of moving to a smaller town where she had lived before coming to Richmond. She testified that he agreed with her, and thought it advisable for her to make the change of residence for the summer; that he said that it would not be pleasant for him to visit her when her daughter was with her, for he knew that the daughter was very much opposed to him; that he said: "It will only be a short time now until we marry;" that she said to him that she had to go to the trouble of moving and asked him: "Why not marry now?" That he said in response to that: "I am a man of my word, and when the three years are up I will marry you." She answered him: "All right, Mr. Vaughan, I will marry you when the three years are up." And further, she stated, that he fixed the month of October next ensuing as the time for the marriage. Taking this in connection with the situation and former relations of the parties, as disclosed by the evidence, the jury was not unwarranted in finding as it

did that this amounted to a new mutual agreement and contract of marriage, to be fulfilled in October, 1906. Surely the jury might well find that this constituted an agreement to marry, and the former one being at an end, this must be a new one. There was also testimony given by another witness, that after the time of this conversation between the parties, appellant told the witness that he was going to marry appellee in October of that year, and that they were going to spend the winter traveling. There were other facts and circumstances from which, in connection with all the other evidence, the jury might well have concluded that the parties had again entered into an agreement to marry. The direct evidence of a contract to marry may be corroborated

5. by circumstantial evidence, and indeed such contract may be proved by the acts and conduct of the parties alone, and for this purpose their relationship and acts, relevant to the promise of marriage, from the inception of their courtship may be given in evidence and considered. The existence of an express contract is not essential, but a contract may be implied from facts and circumstances, and the conduct and relation of the parties. 3 Elliott, Evidence §§1863, 1864, 1868, 1869; 2 Ency. Evidence, 735, 736 and cases cited; *McCrum* v. *Hildebrand* (1882), 85 Ind. 205; *Johnson* v. *Leggett* (1882), 28 Kan. 590; *Parish* v. *Parish* (1903), 67 Kan. 323, 72 Pac. 844; *Leaman* v. *Thompson* (1906), 43 Wash. 579, 86 Pac. 926; *Connolly* v. *Bollinger* (1910), 67 W. Va. 30, 67 S. E. 71; *Rime* v. *Rater* (1899), 108 Iowa 61, 78 N. W. 835; *Olmstead* v. *Hoy* (1900), 112 Iowa 349, 83 N. W. 1056; *McKee* v. *Mouser* (1906), 131 Iowa 203, 108 N. W. 228; *Burnham* v. *Cornwell* (1855), 16 B. Mon. 284, 63 Am. Dec. 529 and note pp. 532-548.

On the trial, appellee called appellant as a witness, and was permitted, over objection, to prove by him that he owned a number of pieces of real estate, and the separate

6. value of each. Another witness was also permitted to testify to the value of certain livery stable property

owned by appellant. While conceding that it was competent in such an action as this to show appellant's wealth in a general way by evidence of his reputed wealth, it is insisted by counsel for appellant that it was not competent to particularize his property and to give evidence as to the value of each particular piece or article thereof. The reason for the admission of any testimony of the defendant's financial standing, which is to enable the jury to fix the money value of the loss of material benefit and social standing by the failure of the marriage, would seem to make counsel's concession decisive of the question of the admission of this evidence against them. If reputed wealth may be considered by the jury in considering the loss the plaintiff in such a case has sustained, surely that loss could be determined more accurately and more justly to both parties from a knowledge of the actual wealth of the defendant. It seems to be the common practice in such cases to allow specific evidence of the defendant's pecuniary circumstances to be introduced. The contrary has been held in a few cases, but the great weight of authority and reason is in support of the practice stated. 2 Ency. Ev. 749, 750; 3 Elliott, Evidence, §1888; 5 Cyc. 1013; *Rime* v. *Rater, supra; Vierling* v. *Binder* (1901), 113 Iowa 337, 85 N. W. 621; *McKenzie* v. *Gray* (1909), 143 Iowa 112, 120 N. W. 71; *Douglas* v. *Gausman* (1873), 68 Ill. 170; *Dent* v. *Pickens* (1890), 34 W. Va. 240, 12 S. E. 698, 26 Am. St. 921; *Reed* v. *Clark* (1873), 47 Cal. 194; *Holloway* v. *Griffith* (1871), 32 Iowa 409, 7 Am. Rep. 208; *Clark* v. *Hodges* (1893), 65 Vt. 273, 26 Atl. 726; *Bennett* v. *Beam* (1880), 42 Mich. 346, 4 N. W. 8, 36 Am. Rep. 442; *McPherson* v. *Ryan* (1886), 59 Mich. 33, 26 N. W. 321; *Birum* v. *Johnson* (1902), 87 Minn. 362, 92 N. W. 1; *Casey* v. *Gill* (1900), 154 Mo. 181, 55 S. W. 219; *Fisher* v. *Kenyon* (1909), 56 Wash. 8, 104 Pac. 1127; *Olson* v. *Solveson* (1888), 71 Wis. 663, 38 N. W. 329; *Salchert* v. *Reinig* (1908), 135 Wis. 194, 115 N. W. 132; *Hanson* v. *Johnson* (1910), 141

Wis. 550, 124 N. W. 506; *Crosier* v. *Craig*, (1888), 47 Hun 83.

In the case last cited it was said: "It is a fundamental rule that the best attainable evidence must be produced, and while evidence of the reputed amount of the defendant's property may not be incompetent, because in most cases accurate knowledge of the amount is confined to the defendant and his friends, yet it cannot be incompetent to permit the amount in defendant's possession to be shown by direct and precise evidence, greatly superior in probative force to evidence of reputation."

See, also, *Hunter* v. *Hatfield* (1879), 68 Ind. 416, 422.

7. On the trial considerable evidence was given by appellee and witnesses for her to show that appellant was practically a daily visitor at her home, and his loverlike attentions to her throughout the month of May, 1904. Appellant, as a witness for himself, vigorously denied this, and testified that the last three weeks of that month he was away from Richmond on a trip to Kentucky, having gone on such a trip with three men, named Spinney, Miller and Kelley; that these men, at the time he testified, were dead, and that he did not make such a trip with them in 1903. On rebuttal appellee and her sister were permitted to testify, over the objection of appellant, to a conversation with them in 1904, in which they stated appellant told them of making a similar trip in 1903. There was no error in admitting this testimony, for it had a tendency to show that the trip in question was made by appellant in 1903, and not in 1904, as he testified, and it was therefore relevant and material. If it had no such tendency, it is difficult to see how appellant could have been harmed by it.

8. Complaint is also made, that appellee was permitted to testify that after her removal from Richmond she wrote several letters and postal cards to appellant in October or November, 1906, and perhaps later, and addressed them to him at his residence in Richmond,

and that she was permitted to prove, by other witnesses, that they were deposited in the post-office. There was no error in this. The court did not permit the contents of these communications to be shown, but just the fact that appellee attempted, in this way, to communicate with appellant. There was evidence to show that when appellant learned of appellee's intended removal from Richmond, and the reasons for it, and just on the eve of her removal, he requested her to write to him, and secured from her what was to be her future address. There was also evidence that appellant afterwards admitted that he had received these letters. But even if appellant had never requested appellee to write to him, and if no such letters ever reached him, it was entirely competent for appellee to show that she attempted to communicate with him in this way. She testified that at the time of her removal from Richmond there was a valid contract of marriage existing between them. If she had removed from Richmond and remained silent, and made no attempt to communicate with him, her conduct would have been most unnatural, and would have required explanation. It would have been entirely inconsistent with the intimate relation between them, then existing. Indeed, appellant himself had testified on the trial, after denying there was ever any marriage contract between them, that appellee left the city of Richmond abruptly, and had never communicated with him thereafter. This was done for the purpose of showing that, there not being any subject of communication between them after appellee left Richmond, there was no probability that any marriage contract had been entered into. Certainly, evidence on the part of appellee that she had attempted to communicate with appellant after she left Richmond would be admissible to rebut this inference.

It is complained that the court erred in refusing to give each of eight instructions which appellant asked to be

9.  given. The first one of these, after stating that the alleged verbal contract of 1904, by which appellant

agreed to marry appellee three years from the death of his wife, which occurred on October 7, 1903, was unenforceable in law, and that appellee could not recover thereon, was on that point fully covered, just as favorably to appellant, by instructions given by the court. Furthermore, in this instruction the jury was told that the verbal contract of 1904 could not be considered for any purpose in determining whether appellant in the months of March or April, 1906, promised to marry appellee. At this time it is proper to say that in the eighth instruction, requested and refused, the court was asked to charge the jury that all the evidence which had been introduced, tending to show the verbal contract of 1904 and all other verbal contracts of marriage between the parties, not to be performed within a year, and prior to the alleged contract of March or April, 1906, should be disregarded by them in determining whether the latter contract had been made by the parties. Neither this latter instruction, nor that similar part of the first instruction above referred to, correctly interpreted the law in this respect, and no error was committed in refusing these instructions. The relations of the parties and their acts and conduct 5. toward each other from the very inception of the courtship, which tended to disclose a mutual intention to marry, may be placed before the jury to aid it in determining whether the minds of the parties had met in an agreement to marry. *Chamness* v. *Cox* (1891), 131 Ind. 118, 30 N. E. 901; 3 Elliott, Evidence §1888 and other authorities hereinabove cited. In harmony with this rule, it has been held that evidence of the acts, conduct and conversations between the parties during a previous intimacy, which was broken off before the mutual promise relied on, may be considered. *Ray* v. *Smith* (1857), 9 Gray 141. Where a contract to marry was made while the defendant was under disability to make it, being already married to another, and after his divorce a new agreement was entered into, evidence of the first was submitted to the jury as a part of the course of the

courtship. *Leaman* v. *Thompson, supra.* The case of *Parish* v. *Parish, supra,* was very similar to this. Therein there had been, it was claimed, a previous agreement to marry, which was not to be performed within a year and a recovery was awarded on a later contract which was not affected by the statute of frauds. Evidence of the alleged prior contract was admitted and considered by the jury, and it was held on appeal that the trial court was well within the rule allowing evidence of the entire intercourse of the parties to go to the jury. In *McKee* v. *Mouser, supra,* the plaintiff relied on a renewal of the previous contract of marriage, and both the original contract and the renewal were, as in this case, denied by defendant. In that case it was held that it was competent for plaintiff to show the former engagement, and the relations existing between the parties prior to the renewal, for the purpose of showing the later agreement to marry.

The second of the instructions requested, attempted to recite the alleged conversation between the parties in regard to marriage in March or April, 1906, and by it the jury would have been told that if it found that such conversation had occurred, it would not constitute any change or modification of the original contract of 1904, and that it would not, either of itself or in connection with the original contract, constitute a valid and enforceable contract of marriage. It was objectionable in that it was incomplete and inaccurate in its recital of the facts necessary to the complete hypothesis; and morever, as we have seen, it was the province of the jury to determine whether from this episode of the courtship of the parties, together with all the other pertinent facts of their relationship, they entered into a new mutual promise at that time, and the latter part of this instruction, therefore, invaded that right of the jury. Instructions two, two and one-half, three, four and five were, in legal effect, but restatements, with varying language, of points correctly instructed upon in the court's instructions. Instruction six was objectionable and

properly refused, for it might well have led the jury
to believe, if it did not indeed say so in direct terms,
that any promise, subsequent to that of 1904, which
appellant might have made to appellee to marry her, was
void and not enforceable, which is not, of course, the law.

Having given consideration to all the questions ably pre-
sented by counsel, and finding no error in the record, the
judgment of the trial court is affirmed.

NOTE.—Reported in 96 N. E. 594. See, also, under (1) 3 Cyc.
348; (2) 5 Cyc. 999; 20 Cyc. 199; (3) 5 Cyc. 1017; (4) 5 Cyc.
1016; 44 Am. St. 381; (5) 5 Cyc. 1012; (6) 20 Ann. Cas. 1265;
(7) 38 Cyc. 1343, 1352; (8) 5 Cyc. 1012; (9) 38 Cyc. 1707; (10)
38 Cyc. 1657; (11) 38 Cyc. 1681.