# TARNOWSKI v. LAKE SHORE AND MICHIGAN SOUTHERN RAILWAY COMPANY.

[No. 22,409. Filed February 5, 1914.]

1. RAILROADS.— *Injury to Trespassers.*— *Evidence.*— *Authority of Brakeman.*—In an action for the death of a trespasser by being kicked off a coal car by a brakeman, the testimony of the brakeman that he was at the time acting as a brakeman for defendant, that on an occasion prior to the occasion in question he had been told by the conductor to keep people away from the train who were liable to steal, though in a measure contradicted by his statement on cross-examination that he did not know of the conductor ever telling him to put men off the train, and that he had never been told to eject men from the train, and evidence showing that decedent belonged to the class of trespassers designated as tramps in defendant's rules, together with the rules of the defendant showing that tramps were regarded as likely to rob cars, and requiring conductors to prevent them from riding, was sufficient to require a submission to the jury of the question whether the conductor had authorized the brakeman to eject trespassers. p. 204.

2. TRIAL.—*Directing Verdict.*—The right to weigh the evidence is for the jury, so that even where there was but one witness and there was conflict between his testimony on direct examination and that given on cross-examination, if there was sufficient from which a jury might have found for the plaintiff, the court could not assume to weigh the evidence and direct a verdict for defendant. p. 209.

Tarnowski *v.* Lake Shore, etc., R. Co.—181 Ind. 202.

3. CONSTITUTIONAL LAW.—*Time for Filing Bill of Exceptions.*—*Statutes.*—Section 661 Burns 1908, Acts 1905 p. 45, providing for the extension of time for filing bills of exceptions, is not in conflict with §24, Art. 1, of the Constitution, and a bill of exceptions filed within an extension granted pursuant thereto, was properly in the record. p. 209.

4. EVIDENCE.—*Conclusions.*—In an action for the death of a trespasser by being kicked off a train by the brakeman, an objection to a question, asking the brakeman what were his duties as brakeman at the time, was properly sustained, as it called for a conclusion. p. 210.

5. RAILROADS. — *Injury to Trespassers.*—*Evidence.*—*Admissibility.*—In an action for the death of a trespasser by being kicked off a train by the brakeman, where the issue was whether the conductor had authorized the brakeman to eject trespassers, there was no error in refusing to permit another brakeman to be asked whether he had ever received such authority from the conductor of his train, since the fact that other conductors on other trains delegated certain authority to certain brakemen would not tend to prove that such authority had been delegated to one whose act produced the death. p. 210.

From St. Joseph Circuit Court; *Walter A. Funk,* Judge.

Action by William Tarnowski against the Lake Shore and Michigan Southern Railway Company. From a judgment for defendant, the plaintiff appeals. (Transferred from the Appellate Court under subd. 1, §1392 Burns 1908, Acts 1907 p. 237, §1.) *Reversed.*

*N. E. Rowley, Martin R. Sutherland* and *Ralph N. Smith,* for appellant.

*M. L. Howell, S. C. Hubbell, V. G. Jones* and *John G. Yeagley,* for appellee.

MORRIS, C. J.—Appellant sued appellee for damages, for the alleged wilful infliction of injuries on appellant's minor son, resulting in the latter's death. The complaint alleges that the decedent was a trespasser, riding on appellee's freight train, and, while the train was running at a high rate of speed, appellee's brakeman, William J. Hunt, while acting within the scope of his authority to eject trespassers from trains, wilfully kicked and shoved decedent from the

rapidly moving train, and thereby caused his death. The cause was submitted, for trial, to a jury, but, at the close of appellant's evidence, at appellee's request, the court directed a verdict for appellee.

Appellant's motion for a new trial, challenging the rulings of the court, in directing the verdict, and in the admission and rejection of certain evidence, was overruled, 1. and such action is here assigned as error. It is contended that the court erred in directing the verdict because there was evidence to support the allegation that the brakeman, when he inflicted the injury, was acting within the general scope of authority conferred on him by appellee, and that the other material allegations of the complaint were fully established by uncontroverted evidence. The determination of this question depends on the existence of any evidence to prove the brakeman's authority. In *Lake Shore, etc., R. Co.* v. *Peterson* (1895), 144 Ind. 214, 42 N. E. 480, 43 N. E. 1, it was held that the fact that the wrongdoer was employed and acting as freight brakeman would not, alone, warrant the presumption or inference that such a brakeman was authorized to eject trespassers from the train on which he was employed in such capacity, but that the burden of proving such authority rests on plaintiff. Appellant is not questioning the rule declared in the Peterson case, but claims that the evidence here is sufficient to meet the requirements of such rule, and bases his contention on certain of appellee's rules, admitted in evidence, and the testimony of brakeman Hunt. Among such rules are the following, relating to freight conductors: "Freight conductors. Special Instructions. 900. Passengers, including employees not on duty, must not be carried on freight trains without proper authority. 901. Tramps or other persons who have no legitimate business on the trains must not be allowed to ride. Every precaution must be taken to prevent cars being robbed while in transit." The following rules, applicable to brakemen, were in force: "Freight brakemen.

950. Freight brakemen report to and receive their instructions from the train master, and while on duty are subject to the orders of the conductor, and at terminal stations must obey the orders of the agent or yard master. 951. They will report for duty 30 minutes before leaving time and assist in making up trains when necessary. Look over the train carefully before starting, and know that all couplings, brake and running gear are in good order. Inspect the train as often as possible. 952. Display prescribed signals at the rear of the train and have all necessary supplies and signals on hand and ready for immediate use. 953. In approaching yard limits, one mile before reaching and while passing railroad crossings at grade, draw bridges, junctions, stations and other points where the train may be required to stop, also in ascending and descending heavy grades, trainmen must be in proper position on top of train, and exchange signals with each other, to ascertain whether train has parted. 954. The brakeman acting as flagman, will compare watches with the conductor before assuming such duties, and they must be governed by the rules for conductors. 955. Rear brakemen, or flagmen, will consider it their especial duty to protect the rear of their train in accordance with the rules, and they must allow nothing to interfere with the prompt and efficient discharge of that duty. They must obey the signal from the engine man as prescribed by the rules, but must never wait for the signal, or for orders from the conductor when their train needs protection. 956. Read all train orders received by the conductor or engine man. 957. The forward brakeman must be on the look-out at all times for signals, especially from the rear of the train, and must keep close watch for indications that train has parted.''

Hunt, the brakeman, testified that at the time of the injury on February 10, 1910, he was on his regular run from Elkhart to Englewood, acting in the capacity of forward brakeman; that his conductor was S. S. Swan, and

the rear brakeman, or flagman, was G. E. Hughes; that the train was a long one, and, after a stop at a station, he got on the train about twenty car lengths behind the engine, and went forward and discovered, on a coal car, eight car lengths behind the engine, the decedent and another boy; that some words and an altercation ensued, and he then went forward to the engine without knowing what became of the boys. When he testified, he was brought from jail where he was imprisoned on a charge of manslaughter in causing the death of decedent. During his direct examination Hunt was asked the following questions, and answered as follows: "Q. Now did you have any conversation with Swan (conductor) in reference to keeping trespassers, or tramps, off the train? A. I believe I did—Yes, sir. * * * Q. What was that conversation, Mr. Hunt? A. There was a great deal of robbing of cars going on at the time; and I was instructed to watch cars and people who would be liable to steal from them. Q. Anything said about keeping tramps off the train? A. *Keep people who would be liable to steal away from the train, yes, sir.*"

On cross-examination, he testified in relation to the above matter, as follows: "Q. Mr. Hunt, when was this conversation that you speak of with reference to this conductor, Swan? A. I would not state the exact date or trip. Q. Was it the last trip you took? A. I could not say whether it was or not, Mr. Drake. Q. Did you have any conversation with him before you started with that train? A. I had conversation with him in the yard office in coming down to the train. Q. Was this conversation at that time about people robbing the train—stealing from the train? A. I could not say that it was, no, sir. Q. Was it at some other time or some other train? A. I do not know the exact date, Mr. Drake. Q. You had a coal train at that time did you? A. Yes, sir. Q. Do you know whether there was anything said at this time about keeping people who were liable to steal, away from the trains? A. I could not say there was

anything said this trip, no, sir.    Q. Isn't it a fact that there was nothing said, to either you or Mr. Hughes, at this trip, about this train?    A. I could not say that there was, no, sir. Q. Now then, if you had a conversation with Mr. Swan, on that last trip, stating about keeping tramps off the trains, state where it was.    A. If it was any place, it was in Elkhart yards.    Q. It was not on the train?    A. No, sir.    Q. Was it a general talk about tramps or about stealing from trains?    A. Well, I could not say exactly, it came up someway that—about some stuff that had been stolen, I believe at Pinola.    Q. From a car?    A. Yes, sir.    Q. Now do you know that this conversation was on the 10th of February? A. No, sir; I could not say that it was.    Q. The conversation was about people breaking into cars, was it not?    A. Yes, sir.    Q. You had a coal train on this 10th day of February?    A. Yes, sir.    Q. All the cars were loaded with coal?    A. I believe so.    Q. Now, what he said to you was 'that there had been a great deal of stealing from cars,' was that it?    A. Yes, sir.    Q. And that you should watch and not let people steal from cars?    A. Said we should watch the train, yes, sir.    Q. And not let people steal from cars?    A. Yes, sir.    Q. Protect it from thieves—protect the train from thieves?    A. Yes, sir.    Q. *And what did he say about keeping tramps from getting on the train?*    A. *I do not know as he said anything about keeping them from getting on the train.*    Q. Just tell what he said?    A. Well, as I remember it, he said that we were to watch the cars and keep people who were liable to steal from getting to them, or getting into them—watch the seals.    Q. *State what, if anything, he ever said to you at any time about putting men off the train?*    A. *I do not know of him ever telling me to put men off the train.*    Q. *Did he ever tell you to eject a man from the train?*    A. *He never told me to eject a man, no, sir.*    Q. Then what you meant to tell he told you was, to protect the car from thieves?    A. Yes, sir.''

On redirect examination he testified as follows:

"Q. *He did tell you to keep people away from the train, that had no business there, didn't he?* A. *To keep people away from cars that would be liable to rob them, Mr. Smith.* Q. *To keep them off the cars too?* A. *I could not say he told me to put anybody off them.* Q. *No, 'to keep people off the cars,' did he use that expresssion?* A. *I could not say that he did, no, sir.*"

It appears that Hunt never told the conductor, or any member of the crew, anything about what happened to the decedent, and that the conductor had no knowledge whatever of anything that happened with reference to him.

Appellee concedes that the conductor was authorized to eject trespassers and tramps from the train, and that it was competent for him to delegate such authority to Hunt, but that no such delegation was proven. That defendant was liable for an injury wantonly inflicted on a trespasser by an employe in ejecting him from the train, while the employe was acting within the scope of his authority, is not denied. If the evidence was such as to warrant a finding that the conductor authorized the brakeman to keep tramps or trespassers off the train, this judgment must be reversed. A young man named Capps testified that decedent and he "were beating their way" on a coal car on appellant's freight train, and that Hunt, the brakeman, kicked decedent off the train, thereby causing his death.

A consideration of rule 901, *supra,* warrants the inference that tramps were regarded by appellant as likely to rob cars and commit other unlawful acts, resulting in injury to its property. The evidence also warrants the conclusion that, at the time, the decedent belonged to the class of trespassers designated in said rule as tramps. On his direct examination, Hunt, in response to the inquiry about keeping tramps off the train, made the affirmative answer of "yes, sir" preceded by the following: "keep people who

would be liable to steal away from the train.'' Rule 901, applicable to conductors, requires the prohibition of tramps, or persons without legitimate business on trains, from riding thereon, and requires the greatest of precaution against the robbing of cars. The evidence of Hunt, given on cross-examination is somewhat contradictory of that given on his direct examination. It is the right of the jury to

2. weigh the evidence, and, in so doing, to reconcile conflict, if possible, and, if not possible, to reject that which is unworthy of belief. If a consideration of the evidence here, most favorable to appellant, together with reasonable inferences therefrom which honest jurors might have drawn, would warrant a finding that the brakeman was authorized by the conductor to keep tramps or trespassers off the train, the trial court erred in directing a verdict. The court was not authorized to weigh conflicting evidence, even where there was but one witness, and even though the conflict appeared between the evidence given on direct and cross-examination. *Peabody-Alwert Coal Co.* v. *Yandell* (1913), 179 Ind. 222, 100 N. E. 758; *Vaughan* v. *Smith* (1911), 177 Ind. 111, 117, 96 N. E. 594. Considering the rules, and Hunt's evidence most favorable to appellant, we conclude that the case should have been submitted to the jury, and that, in directing the verdict, the court committed reversible error.

The trial court, on appellant's request, extended the time for filing his bill of exceptions, containing the evidence, pursuant to the provisions of §661

3. Burns 1908, Acts 1905 p. 45. Appellee claims that said act of 1905 is void, because in conflict with §24, Art. 1, of our State Constitution, and that, the bill of exceptions having been filed too late under any other law, the same is not in the record. We hold that the act is not in conflict with the constitutional provision above named. The bill was filed in proper time, under the provisions of §661 Burns, *supra,* and properly became a part of the record.

Appellant complains of the action of the trial court in sustaining an objection to the following question, propounded to brakeman Hunt: "What were your duties, Mr. Hunt, as brakeman on that day?" There was no error. The question was objectionable because calling for a conclusion. *Grand Rapids, etc., R. Co.* v. *Ellison* (1888), 117 Ind. 234, 20 N. E. 135; *Indianapolis Traction, etc., Co.* v. *Kidd* (1906), 167 Ind. 402, 79 N. E. 347, 7 L. R. A. (N. S.) 143, 10 Ann. Cas. 942. It is contended that the court erred in sustaining an objection to the following question asked Mr. Hughes, the rear brakeman: "Mr. Hughes, did you ever receive any instruction from the conductor of your freight train, while employed by the Lake Shore and Michigan Southern R. Co., as to keeping tramps and trespassers off of the train?" There was no error. The context shows that appellant was seeking to prove that conductors of other trains of defendant, on which the witness had acted as brakeman, had instructed the witness to eject tramps from such trains, but it was not designed to prove any instructions by conductor Swan, while in charge of this, or any other train. The information sought was not relevant to any issue here. The fact that other conductors, on other trains, delegated certain authority to certain brakemen, would not tend to prove that conductor Swan delegated like authority to brakeman Hunt. It might well be that one brakeman could be safely trusted with such authority, while another would be unworthy of such responsibility. It is suggested by appellant's counsel that it was proper to prove a custom or usage, by which brakemen ejected trespassers from trains, which custom was continued for such time as reasonably to warrant the inference that it was known and acquiesced in by the railway officers. The suggestion is sufficiently answered by saying that there was no attempt, by the question in controversy, or by any other, to prove any custom or usage.

Some other questions are presented, but they are not

likely to arise on another hearing, and are not considered. Judgment reversed, with instructions to grant appellant's motion for a new trial.

NOTE.—Reported in 104 N. E. 16. See, also, under (1) 33 Cyc. 889; (2) 38 Cyc. 1536; (3) 8 Cyc. 1011, 1013; (4) 17 Cyc. 209; (5) 33 Cyc. 880. As to liability of railroad for injuries to trespassers on cars, see 55 Am. Rep. 42. As to when opinions of nonexperts are admissible in evidence, see 30 Am. St. 38. As to the implied authority of a brakeman to eject trespassers, see 2 Ann. Cas. 624; 18 Ann. Cas. 892.