JULIA BARTHOLEMEW, Appellee, v. WILLIAM BILLMEYER, JR.,
Appellant.

**BREACH OF MARRIAGE PROMISE:** Evidence—Conduct With Other
Suitors. In an action for breach of promise of marriage, nonremote
testimony bearing on the plaintiff's relation to other men as suitors,
both *before* and *after* the period covered by the alleged engagement
with defendant, may be admissible on an issue as to plaintiff's
good faith in her relations with defendant.

*Appeal from Fayette District Court.*—H. E. TAYLOR, Judge.

APRIL 4, 1924.

ACTION for damages for breach of promise of marriage. Trial
to a jury. Verdict for $3,250. Defendant appeals.—*Reversed.*

*Alf C. Peterson* and *William S. Hart*, for appellant.

*E. H. Estey* and *James D. Cooney*, for appellee.

PRESTON, J.—The action was commenced in November,
1920. At that time plaintiff was about 20 years of age, and the
defendant about 22. They became acquainted about three years
prior thereto. The acquaintance was not followed up, at least
for some little time. They lived about twelve miles apart. It
is alleged that, for a year or such a matter prior to August 7,
1920, the parties became engaged to marry, and that the agree-
ment continued up to and including August 7, 1920. Appellee
testifies positively that no date for the marriage had been fixed
prior to the evening or night of August 5, 1920; that it was
then agreed that defendant should come for plaintiff the next
day or evening, and that they would be married August 7th;
that defendant breached the contract. This is denied by defend-
ant. He testifies that at one time, upon plaintiff's asserting such
a contract, he offered to marry her. He denies the alleged agree-
ment of August 5th, and says that at that time plaintiff told him
she was going to marry another man, with whom she had been

keeping company, and who was then in the house; that he told her that would be all right, but he would marry her on the 7th if she would call him up on the telephone the next day, which she failed to do. He alleges further that the alleged contract was not entered into by plaintiff in good faith, with intent to consummate the same, and that she was under a valid contract of marriage with another party, ratified and confirmed subsequent to the alleged contract with defendant; that appellee expressly waived, repudiated, and renounced the marriage contract, and refused to recognize or consummate the same.

There are some features of the case which are quite out of the ordinary. It appears that, in 1917, defendant was keeping company to some extent with plaintiff's sister, now married; that he went to take the sister to a dance; that she could not go, and introduced appellee, who went to the dance instead. Plaintiff testifies that, after he took her to the dance, early in 1917, she did not see him until June, 1919; that he came down shortly after she had written him a letter or called him on the telephone; that there was a break in their relations between June, 1919, and August, 1920, four or five weeks, but she does not remember when that was.

On March 26, 1919, plaintiff wrote defendant a letter, in which she wrote that he would be surprised to hear from her,—was certain he would; asked him to come down and see her. The letter was signed, "With love."

On June 16, 1919, defendant wrote plaintiff that he would be down, referred to her as "dear," and signed the letter, "with love, your true friend," etc.

On March 21, 1920, defendant wrote plaintiff, addressing her as "dearest," and said that he thought more of her than of anyone else; that he hoped he could make her happy, or he would not "plan on marrying" her. The letter was signed: "From your husband, Budd."

The defendant testifies as a witness that he meant what he said in these two letters, and that at that time he had affection for plaintiff, and intended to marry her.

On April 25, 1920, plaintiff wrote defendant that, if he was good to her, she would not go with Miller; that she could. not get along without him nor with him. She asked him to take

her to dances occasionally, and signed the letter, "Your wife."

There is other evidence by plaintiff and members of her family and others as to the parties' "keeping company," remarks about marriage, and so on.  There is evidence that plaintiff kept company with Miller and with one Humphrey during the time plaintiff and defendant were keeping company.  The defendant did not give plaintiff an engagement ring.  She says she did not care for it, and defendant said, "All right."  There is evidence tending to show that she wore and displayed a ring of Humphrey's.  She says she allowed defendant to wear a ring she had.  This was denied by the defendant.  She testifies that she and Humphrey exchanged rings; that he sent hers back, but she did not return his.  In the evening of August 5th, defendant went to plaintiff's home, and Miller was there with her.  It is at this time that plaintiff testifies that the marriage contract was finally consummated, and that, about midnight that night, she and her mother started sewing for the wedding, and the next day she bought a dress, and she and her mother made it, in preparation for the wedding.  No arrangements were made for wedding festivities.  The circumstances in regard to this transaction and the versions of the different parties will be referred to later.

It appears that, from April to July, 1920, plaintiff was at the home of defendant and his parents.  She testifies that she did work there; that she did as much of the housework as she could,—did everything she knew how,—got meals, mopped the floor, washed dishes, canned fruit, and so on; that defendant told her he owned forty acres of land near there.  He was building on the land and she says he told her he was building the house for their use.  After plaintiff left there, and on August 30, 1920, one of counsel for plaintiff wrote defendant as follows:

"Miss Julia Bartholemew has asked me to collect for her, her wages from April 7, 1920, to July 26, 1920, for which she claims $160.00.  Will you kindly call at the office and settle this matter so that it will not be necessary for me to commence an action against you and make additional costs."

There is no suggestion in this in regard to any claim for breach of promise.  Neither does the petition make any claim for the wages referred to in the letter.  Plaintiff testifies that

defendant never paid her anything for these wages. In November, this suit was brought, asking $5,000 damages for breach of promise.

While plaintiff wrote, April 25th, that she would not go with Miller any more after the dance engagement, she did do so. She was keeping company with all three, Miller, Humphrey, and defendant, more or less. She denies keeping company with Miller and Humphrey to the extent shown by appellant's testimony. The record shows the details of the different times they were together, and their conduct. It is unnecessary to recite the evidence. It seems that defendant was the best worker of the three. She complained somewhat that he neglected her for his work. She testifies that, during the time she was keeping company with defendant, he took her places sometimes, but not very often; that he visited her, they sat up nights, and sometimes went to her sister's; that he took her to one or two dances; that lots of times she would get ready and wait, and he would not come. The others appear to have been more attentive. There is evidence tending to show that her parents, and plaintiff herself, considered that defendant would be the best provider, and that it would be better for her to marry him. It is contended by appellant that plaintiff was leading him on; that though, as he says, the love making was precipitated by appellee, and was afterward mutual on the part of both, still the pronounced preference for both Miller and Humphrey over appellant during their entire acquaintanceship, both before and after and on the night of the alleged marriage contract, negatives her later pretension of any serious purpose to marry appellant at any time.

Plaintiff's version of the transaction the night of August 5th, when it is alleged the contract of marriage was finally entered into, is that, for two or three days prior thereto, she had been at Millers', visiting Miller's sister, and that Miller took her home in his car; that she telephoned defendant from Millers' that she would be home right away, and that he might come; that she and Miller arrived at her home a few minutes before defendant came; that Miller's car was standing in the yard; that defendant knew that Miller was in the house; that Miller was in the kitchen with her and other members of the family; that

she went out to the car, where they talked; that defendant said he would come down the evening of the 6th to get her, and would be down August 7th to marry her; that they were to go to West Union; that she told him she would be ready, and he said, "All right;" that defendant did not come the 6th, nor send word; that she waited for him until 11 o'clock or 12 o'clock; that she dressed up, the morning of the 7th, and waited till noon.

"Father was up town, and saw Mr. Billmeyer up there, and he just said 'Hello,' and Budd said 'Hello;' and when he wasn't anywhere else, I couldn't see any reason why he wouldn't come down."

She further testified that she was disappointed and nervous, —cried; that he has never communicated with her orally or in writing since; that she saw him at a dance, and asked if he would not talk to her; that she called him on the telephone, and asked him to come down; that he said he would, and would be at the State Bank; that she went to the bank, and he wasn't there; that she saw him on the street and asked him why, and he said he just got into town; that he didn't seem to want to talk; that she was ready and willing to marry on the 6th or 7th of August. After the conversation in the car the night of the 5th, she went back in the house. Miller stayed about half an hour longer. Miller testifies that, when he left, he kissed plaintiff good night. When plaintiff went out to the car, her mother went outside, and sat on the steps. After Miller left, plaintiff and her mother commenced sewing on wedding clothes. Plaintiff testifies that she told her father and mother of the agreement and that she was to be married the 7th; that her father went to West Union on the 7th, to do marketing; that they live at West Union now.

"Have clerked at the store, worked as telephone operator, and did housework. Am not working now, and have not done any work for quite a while."

Plaintiff's father testifies that, when defendant drove up, the night of August 5th, Miller was in the kitchen alone with Julia; that he did not know where Miller went; thinks his wife sat on the steps near the car all the time. Defendant sought to show, on cross-examination of this witness, when he next saw plaintiff, and whether witness was not in West Union on the

7th of August; but objection to that line of testimony was sus-
tained.

Defendant testifies that, after he took her to the dance in
1917, he never saw her or heard from her, until her letter of
March 26th.

"A few days after that, she called me on the telephone to
come down. Told her I would as soon as the roads got good.
Went down about May 1st. Did not know where she lived, and
went to. Elgin. Met her and others in car. Didn't recognize
her, but she recognized me, and waved and hollered, and I
stopped. She got in my car. First talk of marriage was at her
brother-in-law's. I was talking about building and they said,
'You must be going to get married,' and Julia said, 'We have the
day all set.' There had been no talk of marriage before that.
There was talk of marriage after that; no time fixed, or any-
thing of that sort. Went with her from June, 1919, to August
5th, 1920, except from November 11 to January 6th. Caressed
her, kissed her, and put my arms around her, as is usually done.
Intended to make her like me and to keep her liking me, but
didn't succeed. If she had liked me, she would have married
me. January 6th, she called me up and wanted me to go
down. I did. She told me that night that Humphrey had been
there, and had gone home the day before she called me up; that
she went to Postville with him, and came back and was crying,
and her sister told her she had better marry me,—that I could
make her a living, and Humphrey couldn't. We were all pres-
ent when she said that, and they told her they thought it was
best for her to marry me. That she was lonesome after Hum-
phrey went home, and so called me up. Said Humphrey had
been there two or three days. She also told me that night
that Miller had been down to see her. After July 4th, there
was talk that, when I had building finished, we would get mar-
ried. After that, I brought her to West Union. Next heard
from her August 5th, by telephone. When I went home August
5th, I didn't think she felt kindly toward me, or she would
have answered me. Kissed her good night. Never asked her to
marry me. When she was at our place, she told me she was
engaged to Humphrey and Miller at the same time."

His version of what occurred the night of the 5th is, briefly

and in substance, this: Called up her mother, who said plaintiff was down at her sister's, and hadn't got home, and would be home in ten or fifteen minutes. Nothing said by her mother that plaintiff was over at Millers', telephoning.

"Plaintiff called me up in ten or fifteen minutes. I told her I was going down, and she said for me not to come that night; said she was going away. I said I was coming down. She said, 'You don't need to.' I said, 'I am coming anyway. If I ain't good enough to come to-night, I ain't at all.' She said, 'I'll tell you about it later; you can't come.' I said, 'I am coming anyway,' and went. After this case was started is the first I learned that plaintiff was phoning from Millers'. Went to her house that night; saw plaintiff. She didn't tell me that night that she had been at Millers' when she telephoned. She met me at the kitchen door. When I drove up to the house, there was a light in the parlor, and when I got into the yard, the light was in the kitchen. She met me at the door, and said, 'You think you are smart.' I says, 'What's the matter? Are you sore?' She said, 'Yes; come out to the car and we'll talk it over.' We went out in the car, and she told me she wasn't going to marry me. She said she was going to marry Miller, because he would be good to her and take her to dances, and I wouldn't go to dances; and I told her if she was sore, and could get along with him better, she might marry him. Told her if she wanted to get married on August 7th, to call me up on the 6th; and she hasn't called me up yet about that. She didn't say whether she would call me up or not. Said all I thought of was work, and that she was tired, and liked to be loved up occasionally, and I didn't love her up only once or twice a week, and that wasn't enough. She told me she was going to the house; that Miller was in the house, and she was going in and sit up with him. Stayed there about two hours in car all the time. Along towards the last, I told her if she would marry me, to call me up the next day. There was no talk that I was coming back next day, and no talk that I was coming back August 7th. Told her if she wanted to get married on the 7th, to call me up on the 6th. Was home all day 6th, but wasn't called up. No telephone to my place August 7th. I went to West Union August 7th. Saw plaintiff's father there."

Defendant then sought to show where he met her father, and what took place between them; but objection to such testimony was sustained. Witness continues:

"When I next saw plaintiff after August 5th was at the fair. She was at the rink dance with Miller; no one with them. Didn't dance or talk with her at the dance; I was mad. Had no talk with her. Never talked with her after that but once, by telephone. December 9th, she called me up, and told me she wasn't to blame; that it was her folks; and wanted me to come to see her. I told her I knew it wasn't her doings, and said, 'You know I have done what is right;' and she said, 'Yes, I do, Budd;' and she asked me what time I would be in West Union. She asked where, and I said, 'Around the bank.' This was after notice of suit had been served on me. From the night of August 5th, had no talk directly or indirectly until the night of December 9th."

He denies some of her statements, and she contradicts some of his testimony, as set out. There were a number of witnesses. The foregoing is only a brief synopsis or skeleton of the facts, showing the general situation. Practically, the difference between plaintiff's story and that of the defendant as to the transaction of August 5th is that she says he agreed to come for her the 6th and they would be married the 7th, and he says he did not ask her to marry him, but that the talk at that time was that, if she wanted to get married on the 7th, to telephone him on the 6th. Clearly, there is a conflict. It would seem that neither of them had any great conception of marriage or a marriage contract. But they were both young, perhaps inexperienced and passionate. Considering their evidence and the other evidence in the case as to their relations and their conduct, we think there was such a conflict as to take the case to the jury on the question as to whether there was a marriage contract and a breach.

1.   Appellant makes strenuous objection to the action of the trial court in confining the evidence to conduct of plaintiff with others, and in limiting the evidence to a time between June, 1919, and August 7, 1920, claiming that the evidence was arbitrarily limited to this period. Some evidence crept in, both before and after those dates. Plaintiff's letter of March 26th,

prior to June, 1919, and evidence of other conduct on her part, was admitted. Apparently, the trial court fixed the period of June because of defendant's letter to plaintiff of June 16th. In numerous instances, appellant sought to go more fully into this, but was met with objections throughout the trial, which were consistently sustained by the trial court. No authorities are cited by appellant.

Appellee cites and relies upon the case of *Schreckengast v. Ealy,* 16 Neb. 510 (20 N. W. 853, 855), where the question is briefly discussed. In that case, defendant sought to show that plaintiff was waited upon by another party after the breach of the contract. Plaintiff objected, on the ground that defendant should be confined in his examination to the marriage contract that was broken by the defendant. The objection was sustained, the court saying:

· ''The question certainly ought to have been restricted to the time the marriage engagement was in existence, and because it was not, the objection was properly sustained.''

Whether this is the general rule, we need not now determine. In the instant case, we think some of the circumstances sought to be shown were so closely associated in point of time as to be relevant as bearing upon the fact as to whether there was a contract of marriage, the good faith of plaintiff, and so on.

Appellee also cites *Robinson v. Craver,* 88 Iowa 381, 386, as holding that evidence that plaintiff, prior to her association with defendant, had kept company with other men, was not admissible. The point at the page cited was this:

''A brother of plaintiff, who had testified on direct examination that, while defendant was keeping company with his sister, no one else was going with her, was asked: 'Did you not, then, at that house on your father's farm, tell Mr. Craver, the defendant in this case, that your sister (the plaintiff) had made a mash on Shadley there, at John Stilwell's?' An objection to the question was sustained on the ground that it was incompetent, immaterial, and irrelevant. The evident drift of this question was to show that the witness had made statements to defendant *inconsistent* with his testimony on direct examination. The question was clearly proper. * * * The ruling of the court placed an undue restriction on the right of cross-examination.''

So far, the case does not sustain appellee's contention, but does, to some extent, sustain some of the contentions of appellant. We assume that appellee refers to a paragraph of the opinion commencing at the bottom of page 386, where it was said that:

"On cross-examination, a witness testified that the plaintiff had kept company with one Mackey, a short time before she began going with defendant. The court, on motion of the plaintiff, struck out this evidence, as immaterial and irrelevant. * * * We think the ruling was right."

The case at this point is readily distinguished from the instant case. In that case, the person inquired about was a mere acquaintance of the plaintiff's, and their intercourse was only ordinary intercourse between a gentleman and a lady. In the instant case, the claim is made, and there is evidence tending to show, that the plaintiff was keeping company with others as suitors. In that case, the court said:

"The defendant's claim seems to be that the conduct of the plaintiff in receiving the attention of young men prior to the time the defendant began keeping company with her is material to the question of *damages*. * * * If such evidence, relating to a time anterior to that when the defendant began to seek plaintiff's society, is ever admissible, surely *it is not* under the circumstances developed in this examination. There was no evidence that the relations existing between the plaintiff and Mackey were other than those usually incident to mere friendly association. * * * Their intercourse, so far as appears, was not different from that which exists in all cases of friendship between persons of the opposite sex who *do not contemplate* marriage. To show such friendly association between the plaintiff and other men at a time prior to defendant's seeking her society is not material to any question involved."

Later in the opinion, the court held that objections to two questions asked were properly sustained, which questions related to declarations by plaintiff, after the defendant had married another, that she did not care if he was married, and what she said was her feeling towards the defendant after that event. Other questions as to her feelings prior to defendant's marriage were held proper. These questions were:

"Q.  Now you may state whether or not, in that conversation, she said anything in regard to whether she *had* cared for your brother; that all she wanted was his money."

"Q.  You may state whether or not, in that conversation, she did or did not say she had never cared anything for the defendant."

These questions are in line with some of the things claimed by the defendant, which he sought to show.  In reference thereto, the court further said:

"Evidence of the plaintiff's * * * declarations made soon after hearing of the defendant's marriage, and relating thereto, and expressive of her feelings towards the defendant, as they existing during the term of the engagement and before it is terminated, is admissible when it tends to show such feelings as are '*inconsistent* with any purpose to fulfill the engagement in a spirit befitting the relation contemplated by it.'  One possessed of such feelings would suffer little or no injury by reason of the breach of the contract.  But evidence tending to show the feeling of the plaintiff towards the defendant after the breach of the contract, and relating only to that time, is never admissible. * * * A declaration of a woman who claims to have had an engagement of marriage, whether made during the existence of the engagement, or after she learns of its breach, that she had not cared for affianced, that all she wanted was his money, certainly has a tendency to show that her object in seeking the engagement was of a mercenary character; that that love and affection so necessary to the enjoyment of the marriage state were wholly wanting * * * The first two questions clearly refer to the feeling plaintiff had for the defendant before his marriage.  Whether she 'had cared' or 'had never cared' for the defendant calls for the condition of her feelings towards him as they existed when she had reason to believe that the marriage would in due time be consummated."

We said, in *Beans v. Denny*, 141 Iowa 52, 61, that it is a universal rule that, in actions of this kind, the conduct of the parties towards each other *during the alleged engagement* may be shown in evidence, as an aid to the jury in determining whether such *engagement in fact existed*, and that this includes sexual intimacy.  Does this mean that only evidence *during the*

*engagement* is admissible? We cannot think so. The cases seem to hold that their conduct from the inception of the courtship may be shown. Doubtless, as contended by appellee, the contract may be shown circumstantially. In such a case, at just what period of time can it be said that the contract is complete, and the minds of the parties meet? It would seem clear, from reading appellant's letter of June 16th, that it cannot be said that at that time there was a contract of marriage. The letter was proper enough, as bearing upon the question whether, during the time prior to August 5th or on August 5th, there was a contract. Plaintiff's letter of March 26th was admitted in evidence, and we think properly. It was the beginning, or practically so, of the relations between the parties, and as bearing upon the question whether subsequently there was a contract. It is doubtless true that the evidence as to the conduct of the parties should not be too remote. We have not as much time to look up the question as we would desire, but we find the following cases on the subject:

In 9 Corpus Juris 353, it is said:

"The acts and conduct of the parties toward, or connected with, each other may be shown, as tending to prove the existence of a mutual promise to marry" (citing some of the cases to follow).

For instance, evidence that, after the making of the promise to marry, plaintiff showed defendant a letter which she had received from a woman to whom defendant had once been engaged, inquiring about plaintiff's engagement with him, and that he dictated her reply, and also the letter itself, are admissible to show the relations of the parties, and, in connection with other evidence, to show that defendant was acting in bad faith toward plaintiff. *Hook v. George,* 108 Mass. 324.

In *Vanderpool v. Richardson,* 52 Mich. 336 (17 N. W. 936), evidence was properly admitted as to the conduct of the parties, where it was offered, not for the purpose of showing the mutual promise, but to show that defendant trifled with plaintiff's affections. That is the claim in the instant case, except that it is claimed that plaintiff was not acting in good faith.

In *Rutter v. Collins,* 96 Mich. 510 (56 N. W. 93), it was held that mutual conduct of the parties subsequent to the

promise may be shown, as tending to show what occurred at the time of the proposal. The court further said:

"A failure to respond to such a letter would have been inconsistent with the state of mind usually associated with a marriage contract."

In *Vaughan v. Smith*, 177 Ind. 111 (96 N. E. 594), it is held that acts of the parties from the inception of the courtship may be shown, when relevant to the promise to marry. See, also, *Cain v. Corley*, 44 Tex. Civ. App. 224 (99 S. W. 168), and *Massucco v. Tomassi*, 80 Vt. 186 (67 Atl. 551), as having a bearing on this proposition.

Referring briefly to some of the evidence excluded, as illustrative: Plaintiff testifies that at one time there was trouble because she got ready to go to a dance with defendant, and he telephoned that he couldn't come, and she said, "All right," and went with Miller; that Miller is a young man she had known since she was little enough to know him.

"Q. How many places have you gone with him? (Objected to as incompetent, etc., unless confined to the time during which plaintiff and defendant were engaged. Sustained, except as to the time from June, 1919, to August, 1920.)

"Court: I am letting you cover period from June, 1919, until August 7, 1920."

The question was not limited, and may well have referred to a time before June, 1919, or August 7, 1920. Perhaps the question should have been more specific; but if it referred to a short time before June, or immediately after August 7th, we think it would have been proper.

Again, plaintiff testified that she got a registered letter from Humphrey while she was out at Billmeyers'; maybe got two while there. This was during the time she had been permitted to testify at length as to working, putting up fruit, etc., at Billmeyers'. She was then asked:

"Q. You had been keeping company with Ray Humphrey for a long time? (Objection sustained because not confined to the time stated.)"

She testified that she had not been keeping company with Humphrey during the period from June, 1919, to August 7, 1920, except that he came to Bennetts' while she was there.

"He ·was there visiting with all of us. Don't remember that I got letters from Humphrey while at Bennetts'. Don't know how many times I called Humphrey on the telephone from Bennetts'. Don't know for sure as to the number of letters I got from Humphrey."

Plaintiff testified that:

"During all the years, defendant gave me no presents, except $5.00, to cover railroad expense. Have been wearing a ring of Humphrey's that I got from him in 1917."

The record shows that defendant moved to strike the answer. It is evident that the objection was by plaintiff, because plaintiff was being examined, and similar objections were being sustained in the same connection, the court stating that inquiries might be made into transactions after June, 1919, but not before. The first part of the answer was clearly competent on another phase of the case, and we think the latter part was proper because plaintiff · had already testified that she had never sent Humphrey's ring back. This necessarily covered the period between June, 1919, and August 7, 1920.

Miller was called as a witness for the defendant, and was evidently an adverse witness. He was asked:

"Q. Before August 7, 1920, and during years 1920 and 1919, were you and plaintiff in company together on different occasions? (Objection, as not confined to proper time.)

"Court: You may start with March, 1919."

Witness testified:

"Accompanied her to places of amusement; out with her to quite a few dances; called on her where she was working or living once or twice a week.

"Q. About how many months or years did you go with her steady, once or twice a week, before August 7, 1920? (Objection, inquiring with reference to a time prior to the time when there was evidence of the engagement. Sustained.) From March, 1919, until August 7, 1920, didn't go much with her. Don't just remember when I went with her steady once or twice a week. Was over at our house and stayed a couple of days in 1920. Took her to the fair. (Motion to strike statement about the fair, because subsequent to August 7th. Sustained. It does not so appear.)"

It will be noticed that in this instance the court permitted defendant to go back to March, 1919. In all other instances where objection was made, the court held appellant strictly to June, 1919.

Witness Miller says further:

''Was at her place August 5, 1920; came there in car, about 8 o'clock. We came alone. When Billmeyer came, I said I was going home, and she said, 'No, stick around a while.'

''Q. Now you may state whether or not you had a talk with plaintiff, whether she would marry Billmeyer or not, when you and Julia were alone. A. Why, I just don't remember. Q. And you may state whether or not she at any time told you she wouldn't marry him. (Objected to as leading. Sustained.)''

The witness was, as said, apparently an adverse witness, and the court might well have permitted the answer.

''Q. State whether or not you did have talks with her when you were alone, about whether she would marry Billmeyer or not. A. I don't remember whether I did or not. I gave a statement with reference to what I knew about the facts of the case, and signed and swore to it. Seems to me that in several conversations between March, 1919, and August 7, 1920, plaintiff told me she would not marry Billmeyer. [After refreshing recollection from the paper shown, says it was several times she told witness she wouldn't marry defendant.] During that period, had conversation with her with reference to Humphrey. She said, if she didn't marry me, she would marry Humphrey. Heard one side of telephone conversation by plaintiff at our place August 5th. She called up Billmeyer and told him not to come; that she wasn't going to be home. Heard a conversation the same evening between plaintiff and her mother. She told her mother she didn't think defendant would come, because his car was broke. She told her mother she could square it all right with Budd; that she had pulled the wool over Budd's eyes before, and that she could do it again. That was the same evening that I took her home, and Billmeyer came there. Stayed at her home until after Budd went home, and for twenty or thirty minutes, then kissed her good night, and went home. Q. Now, how long after that was it before you were over to see Julia

again? (Objected to because subsequent to August 7th. Sustained.)"

Witness continues:

"The night of August 5th, after she came in from her visit with defendant, she told me in the presence of the family that defendant was coming down the next day, and she was going to marry him on the 7th."

On redirect examination, a number of questions were asked in regard to the conversation he heard between plaintiff and defendant over the telephone, and were objected to as leading, which objections were sustained. Some of the questions follow:

"Q. State whether or not you and Julia hurried up and got ready and went over to Bartholemews' right away, so as to get there before Billmeyer."

"Q. Did you and Julia hurry and get ready and leave right away after that conversation?"

"Q. State whether or not you were going over there so as to get there before Billmeyer would get down," etc.

Rolland was called as a witness for plaintiff. Testified that plaintiff worked for him in the spring of 1920. Defendant came there to see her. Cross-examination:

"Worked at my place two or three months, and defendant was there to see her two or three times. No other gentlemen friends came and took her away from my place.

"Q. Isn't it a fact that Miller came there to your place and took her away on different occasions while she was there at your place? (Objection as incompetent, etc., and not cross-examination. Sustained.) Q. Isn't it a fact that, during the time she was working at your place, that Miller on different occasions came there and took her away in the night? (Same record.)"

While it is true that defendant brought out the fact, on cross-examination, that no other gentleman came for her, we think the court might well have permitted other questions thereafter.

While we probably would not reverse for any one of these questions, we have set out enough of the record to show that the trial court unduly restricted the examination in regard to these

matters, and in limiting the examination to the dates mentioned. We are of opinion that this was prejudicial error.

In this connection, another matter should be referred to briefly. Plaintiff testified that, on August 7th, when her father went to town, about noon, defendant and her father met, and each said "Hello." We do not understand that plaintiff was present or in West Union at that time. Her evidence was hearsay, but unobjected to. When plaintiff's father was on the stand, defendant sought to show by him and by defendant, as a witness, what took place between the father and defendant on the 7th, and the evidence was excluded. It seems clear that the "Hello" conversation was being inquired about, and we think that, although it was on August 7th, the matter was one proper to be gone into. It was still August 7th, the day plaintiff alleges that the marriage was to have been performed. It was very closely connected with the transaction of the 5th to the 7th of August. The father had been informed, so he claims, on the night of the 5th, that the marriage was to take place on the 7th. We think the trial court unduly restricted the examination at this point. It was in the nature of impeaching testimony.

The foregoing disposes of a number of the specific assignments of error as to rulings on evidence. They have been argued together, and we have so considered them.

2. Other errors assigned relate to alleged misconduct of counsel in argument to the jury. It is also contended that the verdict is excessive. Since the verdict is reversed on other grounds, it is unnecessary to discuss these matters. These and alleged errors in regard to the instructions and the admission of evidence are such as are not likely to occur on another trial. We forbear discussion of them. The opinion is already too long.

For the errors pointed out, the judgment is reversed and the cause remanded.—*Reversed*.

ARTHUR, C. J., EVANS and FAVILLE, JJ., concur.